IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| JAMES P. GOLDEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 10-0921-CV-W-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security. ) | |
| ) | |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his applications for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in May 1957, has a high school education, and has prior work experience as a delivery person and laborer. He alleges he became disabled on June 12, 2006, due to the aftereffects of a stroke, hypertension, and depression.

On February 23, 2006 – four months before his alleged onset date – Plaintiff was admitted to the hospital with complaints of headaches, blurry vision, and extreme vertigo. He was diagnosed as suffering from a stroke and hypertension. He was discharged on February 27 with instructions to see his personal physician. R. at 210-13. Plaintiff saw his doctor (Dr. Daljeet Singh) on March 7 and reported doing better but still experiencing dizziness; his blood pressure was also uncontrolled. Dr. Singh prescribed Plavix. R. at 255-56. On March 17, Plaintiff's blood pressure had improved and Dr. Singh continued him on Plavix. R. at 253. On March 27, Plaintiff reported light headedness, his blood pressure was not controlled, but his anxiety had improved. Dr. Singh told Plaintiff to decrease his salt intake, stop smoking, and added a prescription

for Diovan to help control his blood pressure.  Id.  On April 10, Plaintiff's blood pressure "control is somewhat erratic" and he was experiencing "increasing anxiety and sometimes he is agitated."  Dr. Singh increased Plaintiff's dosage of Plavix, continued his instruction to take Diovan, and added a prescription for Ativan.  Dr. Singh also reiterated that Plaintiff needed to stop smoking.  R. at 252.

Plaintiff's next visit of note was on June 6 – less than a week before his alleged onset date.  Dr. Singh wrote that Plaintiff was "doing fairly well from the standpoint of his [cardiovascular accident].  He has been taking Plavix . . . His BP control is adequate."  At this time, Plaintiff was still working at the lumberyard and he was advised to be careful because of the increased risk of bleeding that is a side effect of the medications he was taking.  R. at 251.  Plaintiff's next visit to Dr. Singh was on August 4 – two months after his last visit and seven weeks after his alleged onset date.  Plaintiff complained of increased sleepiness that started on July 20 and increased difficulty dealing with heat.  Dr. Singh ordered blood tests.  Plaintiff also requested "more time off," and Dr. Singh noted Plaintiff "has through the 8th off.  We will recheck him on the 7th."  R. at 249.  The nature and origin of his "time off" is not explained in the Record.  In any event, Plaintiff next saw Dr. Singh on September 8: he described Plaintiff as "doing fairly well" although he still had problems with anxiety and depression.  However, his blood pressure was "adequately controlled."  R. at 307.  There was no mention of heat exhaustion, and there was no mention about Plaintiff's request for a medical excuse from work (although it seems Plaintiff last worked on June 12).

On September 10, Plaintiff was hospitalized for injuries incurred when a horse he was riding fell on top of him.  Plaintiff suffered a punctured lung, a lacerated liver, and fractured ribs.  The length of his hospital stay is not clear, but on September 26 he returned to Dr. Singh for a follow-up.  By this time, his liver was healed but he was still experiencing pain and difficulty sleeping.  Apparently, the time off due to the horse accident caused him to lose his job.  Dr. Singh determined Plaintiff's ribs were healing well and prescribed Lexapro.  R. at 306-07.  On October 6, Plaintiff told Dr. Singh that he was "doing fairly well from the standpoint of his pain and his breathing is fine.  He is not coughing. . . . He is not running any fever."  Dr. Singh was concerned about

2

Plaintiff's blood tests, however, and ordered that they be repeated. He prescribed aspirin and noted his intention of putting Plaintiff back on Plavix in the future. R. at 306. Plaintiff returned for a regular appointment on November 17. Dr. Singh wrote that Plaintiff "has been doing fairly well from the standpoint of his health, however, he is unable to work because of his multiple medical problems." Plaintiff had not been Plavix because he could not afford it, and Dr. Singh provided him with samples and helped complete Plaintiff's application for Medicaid. R. at 305.

Plaintiff did not return to Dr. Singh until February 2, 2007. He was "doing well from the standpoint of his health" but (1) still had not quit smoking and (2) still was not taking his Plavix. Dr. Singh refilled his prescription for Plavix and changed the Lexapro (which Medicaid would not cover) to Citalopram. Id. On April 2, Plaintiff reported that Lexapro was helpful but he still had issues with anger control. This medication was continued, the Plavix was replaced with Aggrenox, and a prescription for Klonopin was added. R. at 304. One month later, Plaintiff's anger control was better due to an increase in the dosage of Celexa (which apparently was prescribed at some time) and his blood pressure was controlled. Plaintiff was still smoking and Dr. Singh again emphasized the need to stop smoking. Otherwise, Plaintiff's "physical examination . . . is fairly unremarkable" and no changes were made to his medication. R. at 304. On May 25, Plaintiff reported – for the first time since October – that he was still having considerable pain in his ribs. Dr. Singh told him to take Ibuprofen and took the opportunity to again suggest that Plaintiff stop smoking. R. at 304.

On June 22, Plaintiff reported "getting significant amount of headaches that are not responding to Ibuprofen or Tylenol" lasting for a day at a time. Dr. Singh opined that these appeared to be migraines and prescribed Topamax and provided samples of Maxalt. R. at 302. On July 3, Plaintiff reported improvement but a reluctance to continue taking Topamax. Dr. Singh told him to continue taking the medication and that drowsiness was a normal side-effect. Id. On September 7, Plaintiff reported "signficant problems with headache[s]" and Dr. Singh added a prescription for Seroquel and warned Plaintiff not to drive because the medication could "cause excessive drowsiness." Id. On October 9 Plaintiff reported improvements in terms of headaches,

3

that his "bipolar affective disorder is also under good control." Cardiovascular and blood tests were performed, and on October 30 those results were reviewed with Plaintiff (at which time he was, again, told to stop smoking). R. at 301.

Meanwhile, on August 15, 2007, Plaintiff began going to Pathways Community Behavioral Health for treatment. His initial assessment was performed by Lane Doubenmier, a licensed professional counselor. In most areas noted in the records, Plaintiff was observed to be "within normal limits." He complained of difficulty with anger control, fatigue, and hopelessness, and that his primary reason for seeking treatment was to obtain help controlling his mood and emotions. His GAF score was 59. R. at 292-99. He returned to Pathways on September 12 and saw Ms. Doubenmier again, but the records from that visit are not illuminating. R. at 398.

On January 4, 2008, Dr. Singh completed a medical source statement indicating Plaintiff could occasionally lift and carry ten pounds, sit for a total of one hour per day, stand and walk for zero hours per day, frequently use his hands and feet, should never climb, balance, stoop, crawl, kneel, or push/pull, occasionally reach, handle or feel, and should have some degree of restriction in terms of exposure to heights, moving machinery, chemicals, noise, dust, fumes, and extremes of temperature. Dr. Singh also indicated Plaintiff's mental condition left him seriously limited in his ability to use judgment, deal with stress, or understand and remember complex instructions, and his ability to understand, remember, and carry out detailed and simple instructions was limited (yet satisfactory). Dr. Singh also marked a box indicating Plaintiff would not "suffer the same degree of limitation noted above even without reference to substance abuse or alcoholism." R. at 332-36.[1] On that same day, Dr. Singh's treatment notes state the following:

> James comes in for his disability paperwork to be filled out. He continues
> to have headaches but they are better after he takes his Topamax. He

---

[1]While the records from Pathways indicated Plaintiff smoked marijuana at some point in the past, R. at 295, there was no prior indication that the issue was ever discussed with Dr. Singh.

4

has quit smoking and he states it is substantially better from the standpoint of his breathing. His BP control is adequate.

R. at 394.

On January 22, 2008, Ms. Doubenmier also completed a medical source statement. She indicated Plaintiff's medical impairments left him with serious limitations in his ability to, among other things, relate to co-workers, deal with the public and stress, understand and remember complex instructions, maintain concentration and attention, and "[b]ehave in an emotionally stable manner." She wrote that Plaintiff "has ongoing difficulty coping w/ frustration that occurs due to his physical disabilty as well as interaction w/ others. These appear consistent w/ history of stroke, damage to lung and mood disorder." R. at 339-43. The notes from the visit that day, however, are relatively benign. R. at 399.

On March 13,[2] Plaintiff returned to Ms. Doubenmier and reported that his sleep and appetite were "okay" but that he felt "that he has too much anger." Ms. Doubenmier indicated a new clinician would be meeting with him in the future. R. at 401-02. On April 22, Plaintiff told Dr. Singh that as a result of his visits to Pathways "his issues are under control and bipolar situation is still not resolved completely." Dr. Singh increased Plaintiff's dosage of Depakote to "see if some of the symptoms will subside." R. at 393. On April 24, Plaintiff met with a psychologist at Pathways, Jennifer VonBohland, and reported a great many stressors related to his children and grandchildren and uncertainty about his application for disability benefits. R. at 404-05. On May 22, Plaintiff told Ms. VonBohland that he "gets in his car and drives to relax," that his "hobbies include hunting, fishing, camping, motorcycle riding" and walking his dog. He again reported that his major stressors were "watching grandchildren too often" and "concern [about] his disability case and when the case will be decided." R. at 407-08. Plaintiff was a "No Show to two scheduled sessions" but returned to Pathways on June 5. His GAF score was consistently reported as 59.

---

[2]Doctor visits for reasons unrelated to the medical and mental issues that are relevant to this case have been omitted.

5

On June 25, Plaintiff reported to Dr. Singh that he had resumed smoking. In all other respects the treatment notes were unremarkable. R. at 392. Nonetheless, the next day Plaintiff met with Ms. VonBohland and reported that his doctor told him he could not return to work "due to his previous stroke and because he has 1/2 of his lung removed." R. at 413-14. In these – and other – visits to Pathways, the treatment provided consisted of counseling and "reflective listening." On November 25, Plaintiff saw Dr. Singh after going to the emergency room "because of some confusion and slurring of speech." Blood tests from that visit were positive for marijuana, which concerned Dr. Singh – as did the fact that Plaintiff was still smoking a pack of cigarettes per day. R. at 437.

Plaintiff underwent a consultative examination performed by Dr. John Sand on November 24, 2008. Dr. Sand opined that Plaintiff is generally not significantly limited in his ability to perform work-related activities. He indicated Plaintiff could sit eight hours a day, stand or walk one hour at a time for a total of four hours per day, frequently lift and carry up to twenty pounds, and occasionally lift and carry up to one hundred pounds. Dr. Sand's narrative reinforces that he believed Plaintiff was not suffering serious effects from his stroke and hypertension. R. at 424-31. Plaintiff also underwent a consultative examination performed by a psychologist (John Keough) on December 8, 2008. Keough opined that Plaintiff had the ability to understand and follow instructions "somewhere between the simple to moderate level of complexity," could adequately maintain concentration, persistence, and pace, and was "mildly to moderately limited" in his ability to interact with others. R. at 443-48.

During the hearing, Plaintiff testified that he has looked for work, but Dr. Singh won't approve of him working, saying if Plaintiff works he will be "signing my death certificate." When asked what reason Dr. Singh gave for this warning, Plaintiff stated he gave none. R. at 25, 34. He described his activities as fishing and playing with his grandchildren at the playground or park (although he does not fish for as long as he used to). R. at 27-28, 38. He testified that Topamax relieves his headaches within thirty minutes of taking it, and that his anger is effectively controlled with medication. R. at 30, 33. He also indicated that he gets light-headed if he stands up too quickly and

6

that the headaches occur every four to five days and can last up to three hours (unless, as indicated earlier, he takes his medication). R. at 29-31. Plaintiff's wife also testified that her husband's short term memory is lacking and that he seems confused a lot. R. at 36.

A vocational expert ("VE") testified in response to the ALJ's hypothetical questions. She was first asked to assume a person of Plaintiff's education and work history who was limited in the manner described in Dr. Sand's consultative report, and she testified that such a person could perform light work and as an example gave the position of parking lot attendant. However, due to the need to limit Plaintiff's exposure to dust, fumes, extreme cold and extreme heat, she reduced the number of available positions by 75%, meaning there were between 22,000 and 23,000 such jobs the hypothetical person could perform. R. at 47-49. The ALJ next asked the VE to consider the limitations described in John Keough's consultative report, and she testified that nothing in that report would preclude the person from working as a parking lot attendant. R. at 49-50. Plaintiff's counsel started to ask questions concerning Dr. Singh's and Ms. Doubenmier's medical source statements, but the ALJ interrupted, explaining that if he adopted those opinions then Plaintiff was unquestionably disabled. R. at 50-51. Ultimately, however, the ALJ found neither report to be credible because they conflicted with the other evidence provided by the authors of those statements. R. at 15-16. The ALJ found Plaintiff was limited to the extent described in Dr. Sand's and Mr. Keough's reports and, based on the VE's testimony, found that while Plaintiff could not return to his past relevant work he could perform other work in the national economy.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714

7

(8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

Plaintiff's arguments revolve around a central theme: the ALJ's assessment of his residual functional capacity was not supported by the evidence. The Court will begin by examining Plaintiff's claim regarding the rejection of his doctors' opinions. Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Dr. Singh's medical source statement is inconsistent with his treatment notes. Nowhere in his treatment notes does he suggest Plaintiff is incapable of walking or standing or that Plaintiff is incapable of sitting for more than one hour. The starkness of this inconsistency is so great that it casts doubt on everything contained in Dr. Singh's medical source statement. Ms. Doubenmier's statement was rendered after two visits, the first of which noted Plaintiff was functioning within normal limits and assessed a rather high GAF score, and the second of which was unremarkable. There is no apparent basis for Ms. Doubenmier's rather restrictive conclusions.

In assessing Plaintiff's functional capacity, the ALJ was entirely justified in relying on the contemporaneous treatment notes and other evidence in the Record. As detailed in Part I of this Order, Dr. Singh's treatment notes do not suggest any serious limitations on Plaintiff's ability to work due to the aftereffects of his stroke or the incident involving the horse. Similarly, nothing noted by Ms. Doubenmier – or by anyone at Pathways – suggests Plaintiff's mental limitations preclude him from working.

The medical evidence (or lack thereof) is also a factor to be considered in evaluating Plaintiff's testimony. The familiar standard for analyzing a claimant's

subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.[3]

---

[3] Current regulations incorporate these considerations, the Eighth Circuit has declared that the "preferred practice" is to cite Polaski. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

9

Plaintiff's activities are inconsistent with a claimed inability to work.[4] Plaintiff correctly argues that a person can be disabled even if they carry on normal every-day activities, but those activities are still relevant. The ALJ did not require Plaintiff to be bed-ridden; instead, the ALJ noted (as does the Court) that Plaintiff's activities are inconsistent with the specific disabilities he claims to suffer. The Record also reflects that Plaintiff medical conditions (hypertension, blood pressure, headaches, anger control) were alleviated or controlled through treatment. The ALJ was entitled to reject Plaintiff's testimony regarding drowsiness; while the medication could cause drowsiness the issue was hardly raised with Dr. Singh or the staff at Pathways.

Finally, Plaintiff faults the hypothetical questions posed to the VE for failing to include "mention of Golden's headaches, his use of multiple psychiatric medications, or his bouts of acting out in anger." Plaintiff's Brief at 25. Generally, the ALJ is to include limitations, not medical conditions. Moreover, if a medical condition is controlled with medication such that the medical condition does not impose functional limitations, then there is no need to mention it (unless, as was not the case here, there is a finding that the medication causes a side effect that itself imposes functional restrictions). Here, Plaintiff testified (and the Record reflects) his headaches were controlled with medication. Plaintiff's anger issues were also controlled, and the ALJ reflected this condition in the hypothetical by including limitations on his ability to work with the public, co-workers, and supervisors. R. at 49-50. Plaintiff's argument that the "borderline intellectual functioning" found by Mr. Keough should have been included is also rejected because it was incorporated in the hypothetical question in the form of limits on the complexity of the jobs Plaintiff could perform. Cf. Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001).

---

[4] They are also so inconsistent with Dr. Singh's medical source statement that they present another justification for the ALJ's conclusion that Dr. Singh's statement was unreliable.

## III. CONCLUSION

The ALJ's final decision is supported by substantial evidence in the Record as a whole, so the Commissioner's final decision denying Plaintiff's claim for benefits is affirmed.

IT IS SO ORDERED.

                                              /s/ Ortrie D. Smith
                                              ORTRIE D. SMITH, SENIOR JUDGE
DATE: September 12, 2011                UNITED STATES DISTRICT COURT